340 P.2d 403

Ethel Pearl JOHNSON and Malcolm Lee Johnson, Appellees,

v.

ZIA COMPANY, a Corporation, Appellant.

No. 6490.

Supreme Court of New Mexico.

June 4, 1959.

Seth, Montgomery, Federici & Andrews, Santa Fe, for appellant.

O. Russell Jones, Jack Smith, Santa Fe, for appellees.

McGHEE, Justice.

The plaintiff Ethel Pearl Johnson recovered judgment against the defendant for the sum of $7,500 following a verdict rendered in her behalf by a jury on account of leg injuries suffered by her in Los Alamos when she stepped on the lid of a water meter and it tilted, letting her leg down into the meter box.

The premises on which the injury occurred had been rented to her husband under a written lease styled "Family Housing Agreement" under which the renter would have been responsible for the maintenance and cleaning of the meter box had it not been for a bulletin put out to the renters of the Zia Company which stated it supplemented the family housing agreement (rental contract) and wherein it was stated, among other things:

"This bulletin supplements your family housing license agreement, spelling out examples of the types of repairs and maintenance for which you are responsible and examples of the types of repairs and maintenance for which the Zia Company will assume responsibility."

It was also stated therein:

"A word of caution would appear to be in order regarding the repair of electrical facilities, gas appliances or plumbing facilities on your premises. Such work should be performed by The Zia Company, and will be performed free of charge, unless the work involves a repair or replacement for which you are responsible under the terms of the License Agreement. For service in connection with the maintenance or repair of your premises, you may telephone our Maintenance Section at 7–4214."

In addition we have the following testimony of a utility engineer of the defendant:

"Q. Do you know whose responsibility it is to perform the maintenance and repair work on these meters? A. Yes, Sir, Mr. Armstead is in charge of that.

"Q. Is that closely connected with your department? A. Yes, sir.

"Q. As far as your company is concerned the tenants aren't supposed to interfere with the water meters, are they? A. Absolutely not."

■ This, we think, effectively disposed of the contention of the defendant that it was the duty of Mrs. Johnson and her husband who, incidentally, was also a plaintiff but was denied any damages and did not appeal, to maintain the meter, and also the claim it was liable only for a willful injury to such claimed licensees. The relation of landlord and tenant existed between The Zia Company and the Johnsons and not that of licensor and licensee.

The defendant also operates the utilities in Los Alamos.

■ Mrs. Johnson had gone out in the yard to turn off a hydrant and stop the lawn watering theretofore started by her husband, when she stepped on the meter lid which was on her route to the hydrant and a tilting of the 32-pound lid resulted and her right leg went into the meter box as above stated.

Mr. Johnson testified that immediately after the accident he lifted the lid and examined the meter box and found the rim, which holds the lid to the meter box, filled with dirt up level with the top of the rim. The next day the Safety Supervisor of the defendant also inspected the meter box and testified that he found only a few spoonfuls of dirt and grass caked in the rim which he cleaned out with a knife but he did not say what size spoon he was talking about. It was for the jury to determine which of these witnesses it believed.

■ The meter had been read by an employee of the defendant seventeen days before the accident, and while he testified

that he had cleaned out the rim when he lifted the lid and read the meter, and that such was a part of his regular duties, in view of the large amount of dirt which Johnson testified was present on the day of the accident, it would appear that the jury was well within its rights in refusing to believe the testimony of the meter reader on that point.

There was no testimony to the effect that the lid would not have tilted when Mrs. Johnson stepped on it had it not been for the dirt and grass on the rim but the case was tried on that theory, and we have her testimony that she had stepped on the meter lid a great many times during her five years' residence on the premises, and that it had never tilted until the time of the accident.

The defendant strongly contends that the verdict was based on speculation, conjecture and surmise, and that there is no substantial evidence in the record on which a verdict could validly be returned for Mrs. Johnson. We have no fault to find with the cases it cites holding a verdict so returned may not be sustained, but we do not agree with its appraisal of the record. .

█ We are of the opinion and hold there is sufficient substantial · evidence, coupled with reasonable inferences that may be drawn therefrom to sustain the verdict, and that the judgment should be af-firmed unless there is reversible error on the other points urged by the defendant.

We have carefully considered all of the New Mexico landlord and tenant cases cited by the defendant, as well as its meter cases from other jurisdictions. In none of these cases had the landlord assumed the duty of looking after the meters or making repairs. Because of this feature none of the defendant's cases on the point the landlord was not responsible for the condition of the meter are controlling or persuasive here.

█ The defendant asserts that the trial court erred in refusing to give his requested instruction No. 4, which read:

"You are instructed that it was the duty of the plaintiffs under the 'Family Housing License' to maintain the grass and grounds upon the premises they were occupying and that if plaintiffs permitted grass to grow around or into the meter box so that the lid did not fit properly, and that this was a proximate contributing cause of plaintiff's, Ethel Pearl Johnson's, injuries, then your verdict must be for the defendant."

The defendant bases its claimed right to this instruction on section 8 of the rental agreement or what is called the "Family Housing License Agreement," which reads:

"The Licensee shall protect and maintain in good condition the lawn and such trees and shrubbery as exist on the premises upon the effective date of this agreement, and, in addition, the Licensee agrees that the Licensor may landscape the premises in such manner as the Licensor deems desirable and the Licensee shall assume responsibility for protecting and maintaining in good condition such landscaped grounds when given notice to do so by the Licensor. If the Licensee fails to maintain the landscaped grounds in good condition, the Licensor, after giving three (3) days' notice to the Licensee, may provide restoration or necessary maintenance including the watering and mowing of grass, and the Licensee shall be liable for the reasonable cost thereof. However, the Licensee shall not be liable for any damage to such grounds resulting from causes beyond the reasonable control of the Licensee."

This seems to us to be a clause requiring proper care of the lawn, trees and shrubbery on the part of Johnson rather than a provision that grass should be so trimmed that it would not get in the meter box, but giving the language of that section the construction contended for by the defendant the requested instruction goes too far. It would have relieved the defendant of liability if the grass had been allowed to grow around the outside of the meter box even though not a single blade of grass had grown into it. There was no testimony that the grass in the lawn was of a variety which had runners such as bermuda, or that any grass had grown into the box. Surely, grass which was only around the outside of the meter box could not cause the 32-pound lid to tilt.

The trial court did not err in refusing to give the requested instruction.

■ The defendant next asserts that in any event the award of $7,500 as damages was excessive in view of the nature of the injuries suffered when we take into consideration the entire medical and hospital expenses amounted to only $457.54.

The point made by the defendant on the damage question reads:

"The trial court erred in refusing to grant a new trial or remittitur, as the verdict of the jury was so excessive that it indicates passion, prejudice, partiality, sympathy, or that the jury was mistaken as to the measure of damages."

The defendant calls our attention to the fact that in the complaint Mrs. Johnson only asked for damages for hospitalization and medical treatment, past and future, and for permanent injuries to her right leg, and that nothing was asked for disfigurement or pain and suffering. It overlooks the fact, however, that she gave testimony without objection that she endured a great

deal of pain and suffering from the time of her injury to the time of trial which was begun on April 30, 1958. Also, the trial court instructed the jury without objection that in addition to damages for expense and disability it could take into consideration her pain and suffering, and if it found in her favor it could fairly compensate her for such in addition to the expense and disability. Having litigated the question of her pain and suffering without objection, it may not urge error here on that account. The complaint will be deemed amended to include such items. Luvaul v. Holmes, 1957, 63 N.M. 193, 315 P.2d 837; Posey v. Dove, 1953, 57 N.M. 200, 257 P.2d 541; George v. Jensen, 1946, 49 N.M. 410, 165 P.2d 129.

■ As above stated, Mrs. Johnson testified that the leg had given her a great deal of pain since the accident up to the time of the trial; that she had to wear an elastic bandage around her leg or use crutches; that she could not stand on her feet for any length of time, and because of the injury she was greatly handicapped in getting around and doing any considerable amount of housework, whereas before the injury she was well able to do all of her housework, including the washing and ironing.

One medical witness who treated her testified there was an injury to a vein, and that in his opinion it was permanent and the injury would probably create difficulty in terms of inflammations if she stood for long hours or walked too far.

■ As the trial court instructed the jury there is no fixed rule, formula or standard for determining and measuring damages for pain and suffering, and it is for the jury to fix compensation therefor and its judgment will ordinarily not be overturned.

In view of the testimony in the case we decline to hold the damages awarded were excessive. The judgment will be affirmed, and

It is so ordered.

LUJAN, C. J., and COMPTON, J., concur.

MOISE, J., not participating.

CARMODY, Justice (dissenting).

The majority holds that there was sufficient substantial evidence, coupled with reasonable inferences drawn therefrom, to sustain the verdict. With this I am unable to agree. There is a complete lack of any evidence of negligence on the part of the defendant. That there was some dirt in the rim of the meter was proved (although we do not know how long it was present nor how it became lodged therein) and it could be inferred from this that the dirt was the cause of the tilting of the lid, but to also infer from the mere pres-

ence of the dirt that the defendant knew or should have known that this created a dangerous condition is, in the absence of any testimony at all on the subject, sheer speculation and conjecture.

The vice in the majority opinion is two-fold. First, it sustains a verdict based upon surmise, speculation and conjecture as to the proof of the basic issue in the case, i. e., negligence of the defendant. As to this, we have held many times that such a verdict must not be allowed to stand. Second, and possibly even more serious, the effect of the majority opinion is to allow the jury to assume as true the exact opposite of a fact testified to by a witness (the meter reader) who was neither impeached nor contradicted. Admittedly, the jury had the right to disregard the testimony of the meter reader as to his cleaning out the meter seventeen days before the accident. However, they did not have the right to come to a direct opposite conclusion without any evidence thereon. The jury might refuse to give credence to a statement of a witness, but they are not at liberty to infer from the rejected testimony a fact directly contrary to that which has been sworn to by the witness, absent some credible testimony or evidence to support such a finding. Hyslop v. Boston & Maine R. R., 1911, 208 Mass. 362, 94 N.E. 310, 21 Ann.Cas. 1121, Note 1123; City of Waco v. Criswell, Tex.Civ.App.1940, 141 S.W.2d

1046; and Medler v. Henry, 1940, 44 N.M. 275, 101 P.2d 398.

The majority having determined otherwise than I feel is proper, I dissent.